AO 106 (Rev. 06/09)   Application for a Search Warrant

# UNITED STATES DISTRICT COURT

**FILED**

for the

Eastern District of Missouri

**FEB 2 8 2020**

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

**In the Matter of the Search of** )
**The premises located at 5328 Bancroft Avenue, St. Louis,** )
**Missouri, 63109**, further described as a multi-family two- )
story residence with a basement in St. Louis City, Missouri. )
The Premises is located on the south side of Bancroft )
Avenue, in between Macklind Avenue and Brannon )
Avenue. The Premises is a brown brick house with a white )
stone foundation. The Premises also has white siding on the )
left side of house fully depicted below. The dwelling has )
two exterior front doors, a left side door that leads to the )
upstairs unit, and a right side door that leads to the Premises. )
The Premises has a screen door that covers a three-pane )
glass window front door. The numbers 5328 are displayed )
on the front of the Premises. )

Case No. 4:20 MJ 1069 (JMB)

## APPLICATION FOR A SEARCH WARRANT

I, RYAN TIGHE, a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

**The premises located at 5328 Bancroft Avenue, St. Louis, MO 63109 as fully described above,**

located in the _____ EASTERN _____ District of _____ MISSOURI _____, there is now concealed
see ATTACHMENT B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

✓ evidence of a crime;

✓ contraband, fruits of crime, or other items illegally possessed;

✓ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

*Code Section*                                   *Offense Description*

Title 21, U.S.C., §§ 846, 841(a)(1)      Conspiracy to distribute and possess with intent to distribute controlled substances

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE.

✓ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is
requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

RYAN TIGHE, Special Agent
Drug Enforcement Administration
*Printed name and title*

**Sworn to before me and signed in my presence.**
Date: _____ February 28, 2020

_____
*Judge's signature*

City and State: _____ St. Louis, MO      Hon. John M. Bodenhausen, U.S. Magistrate Judge
*Printed name and title*
AUSA:   STEPHEN CASEY

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Ryan Tighe, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 5328 Bancroft Avenue, First Floor Unit, St. Louis, Missouri 63109 (hereinafter the "Premises") further described in Attachment A, for the things described in Attachment B.

2.      I am a Special Agent with the Drug Enforcement Administration (DEA), duly appointed according to law and acting as such. I have been a Special Agent with the DEA since January 2018. I am currently assigned to the St. Louis Division Office, Task Force Group 31. In the course of my employment with DEA, I successfully completed Basic Agent Training at Quantico, Virginia, and have received specialized training and experience in the investigation of narcotic related offenses concerning violations of the Controlled Substances Act contained within Title 21, United States Code, including the transportation, distribution and sale of controlled substances. I have been trained to recognize the methods and trends of trafficking illicit drugs and the laundering of drug proceeds. Upon my successful completion of Basic Agent Training I was assigned to the St. Louis Division Office Task Force Group 31. I have since been involved with numerous narcotics related investigations which have resulted in the seizure of narcotics and narcotics related assets.

3.      Prior to my commission as a DEA Special Agent, I was employed as a Customs and Border Protection Officer (CBPO) at the Port of Buffalo, NY from 2015 to 2017. Prior to being a CBPO I was employed as a Border Patrol Agent at the El Centro Station in Imperial, California from 2008 to 2015. During my tenure in law enforcement, I have been involved in

numerous investigations involving drug trafficking organizations (DTO). Based on my training, experience, and participation in controlled substance investigations, I am familiar with the methods of operation of drug traffickers. I have participated in numerous drug investigations which have resulted in the seizure of fentanyl, cocaine, heroin, marijuana, methamphetamine, and other controlled substances. I am familiar with and have used normal methods of investigation including, but not limited to, visual surveillance, electronic surveillance, questioning of witnesses, the use of search and arrest warrants, the use of informants, the utilization of undercover agents and the use of court-authorized wire intercepts, I am also familiar with federal criminal laws, particularly those laws relating to narcotics. Additionally, I am part of an experienced team of narcotics investigators that have participated in numerous drug trafficking investigations utilizing various investigative techniques. I am familiar with the methods employed by large scale narcotics organizations in attempts to thwart detection by law enforcement, including but not limited to the use of cellular telephone technology, counter surveillance techniques, false or fictitious identities and addresses, money laundering techniques, and coded communications and conversations.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, I believe there is probable cause that violations of Title 21, United States Code, Section 841(a)(1), possession with intent to distribute cocaine, and Title 21, United States Code, Section 846,

2

conspiracy to possess with intent to distribute cocaine, have been committed by John REMLEY or other persons known and unknown. There is also probable cause to search the Premises described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## LOCATION TO BE SEARCHED

6.      The Premises is further described as a multi-family two-story residence with a basement in St. Louis City, Missouri. The Premises is located on the south side of Bancroft Avenue, between Macklind Avenue and Brannon Avenue. The Premises is a brown brick house with a white stone foundation. The Premises also has white siding on the left side of house fully depicted below. The dwelling has two exterior front doors, a left side door that leads to the second floor unit, and a right side door that leads to the Premises. The Premises has a screen door that covers a three-pane glass window front door. The numbers 5328 are displayed on the front of the Premises. The Premises is described in Attachment A.

7.      Utility checks were performed for 5328 Bancroft Ave and revealed that Robert Hurst Jr. (HURST) is listed as having active utilities for the first floor unit of 5328 Bancroft Avenue. HURST has a criminal history that includes arrests and/or convictions for burglary, robbery, assault, theft, unlawful use of drug paraphernalia, and possession of stolen property. Record checks indicate that HURST has had active utilities in the first floor unit since August 2017. Additionally, HURST listed the telephone numbers (314) 765-5254 and (314) 701-3877 for his utility account. Furthermore, and as described in detail below, HURST and Subin MADATHIL

3

(MADATHIL) were observed on surveillance at 5328 Bancroft on February 20, 2020. As described below, MADATHIL also has a vehicle registered in his name to 5328 Bancroft Avenue.

## PROBABLE CAUSE

8.      In January 2020, DEA St. Louis Task Force Group 31 (TF31) and St. Charles County Drug Regional Drug Task Force (SCCRDTF) initiated an investigation into the drug trafficking activities of John REMLEY (REMLEY) after obtaining information from a Confidential Informant[1] (CI). REMLEY has a criminal history that includes arrests and/or convictions for receiving stolen property, and dist/del/manuf controlled substance. The CI identified his/her cocaine source of supply as REMLEY, who resides in the metropolitan area of St. Louis, MO.

9.      The CI informed investigators that REMLEY utilizes the aforementioned cellular telephone number to facilitate narcotics transactions. Additionally, the CI informed investigators that REMLEY often uses Snapchat[2] to communicate and coordinate drug transactions. The CI

---

[1] The CI is documented with the St. Charles County Regional Drug Task Force, and is cooperating with investigators in an attempt to mitigate pending charges relative to a prior arrest for possession of cocaine. In January 2020, the CI was arrested by Saint Peters, MO Police department after being found in possession of approximately two (2) ounces of cocaine. The CI has a criminal history that includes arrests and/or convictions for controlled substance related offenses, bad checks/obtain control prop, driving while intoxicated, domestic assault, endangering welfare of a child, felonious restraint, peace disturbance, driving while revoked, defective equipment, misc pedestrian violation, and littering. The information provided by the CI as it relates to this investigation has been corroborated and is believed to be reliable based upon law enforcement actions, including recorded surveillance, telephone toll analysis, and other investigative techniques. The CI's information has never been found to be false or misleading and has been utilized in the on-going investigation into REMLEY's drug trafficking activity.

[2] Snapchat is a messaging app that lets users exchange pictures and videos (called snaps) that are meant to disappear after they are viewed. Snapchat also lets you send disposable text messages to your friends, which is called "Chat."

4

advised investigators that he/she would be able to make controlled purchases from REMLEY and introduce an undercover officer as a new buyer to REMLEY. In January of 2020, the CI, as accompanied by a SCCRDTF detective who was acting in an undercover (UC) capacity, conducted two controlled purchases of cocaine from REMLEY. During each of these controlled purchases REMLEY sold the CI and the UC one (1) ounce of cocaine for $1,500. The first buy took place in the parking lot of IMO's Pizza, located at 1000 Hampton Ave, St. Louis, MO 63110. The second buy took place at the mobile gas station located at 13553 Riverport Drive North, Maryland Heights, MO 63043. As a result of the aforementioned controlled purchases, the UC was able to position him/herself to purchase cocaine directly from REMLEY, without the CI's cooperation or presence required. The details of the subsequent UC controlled purchases are described below.

### A.   Controlled Purchase of Cocaine on February 11, 2020

10.     On February 11, 2020, investigators conducted a controlled operation during which the UC purchased one ounce of cocaine from REMLEY. Your affiant was present for the operation. At the onset of the controlled operation, investigators monitored court authorized precision location information (PLI) associated to REMLEY's cellular device provided by the CI and learned that the device was located in the vicinity of 4053 Russell Blvd, St. Louis, MO. Members of the surveillance team set up surveillance on 4053 Russell Blvd, and shortly thereafter, at approximately 1:45 p.m., Task Force Officer (TFO) Christopher Moss observed a white

5

Volkswagen Tiguan bearing Missouri license plate TB8-H3S[3] driving away from 4053 Russell

Blvd. TFO Moss observed REMLEY driving the Volkswagen Tiguan accompanied by his believed

to be girlfriend, Sarah HOLDER[4] (HOLDER). Moving physical surveillance of the Volkswagen

Tiguan was established at this time. Surveillance at 4053 Russell Blvd. was terminated and all

members of the surveillance team stayed with the Volkswagen Tiguan.

      11.    At approximately 2:53 p.m. SCCRDTF Sgt. Bill Rowe observed the Volkswagen

Tiguan arrive back at 4053 Russell Blvd. Sgt. Rowe observed HOLDER get out of the front

passenger seat and get into a red Volkswagen sedan that was parked in front of 4053 Russell Blvd.

Sgt. Rowe observed the red Volkswagen drive away from the residence; surveillance was not

maintained on the red Volkswagen as it left. After HOLDER got out of REMLEY's vehicle, Sgt.

Rowe observed the Volkswagen Tiguan leave the residence (4053 Russell Blvd.) traveling

eastbound on Russell Blvd. At approximately 2:55 p.m., REMLEY called the UC and advised the

UC that he (REMLEY) needed about twenty minutes and he would be ready to meet the UC to

conduct the drug transaction. The aforementioned phone call was recorded, and later downloaded

and submitted into evidence. At approximately 3:10 p.m., due to a high volume of vehicle traffic,

---

[3] Law enforcement database queries revealed that the registered owner of this vehicle is John Remley, 4053 Russell Blvd, Saint Louis, MO 63110.

[4] Utility checks for 4053 Russell Blvd, Unit A lists active utilities under the name "Sarah Holder." Investigators ran record checks through the Missouri Department of Revenue and were able to obtain a photograph of HOLDER. Open source searches of REMLEY and HOLDER's social media accounts were conducted; several posts containing pictures of REMLEY and HOLDER together were displayed on their profiles. Based on the pictures, investigators believe HOLDER to be the girlfriend of REMLEY.

members of the surveillance team temporarily lost visual of the Volkswagen Tiguan. At that time investigators checked the PLI associated to REMLEY's cellular device and learned that the device was in the vicinity of **5328 Bancroft Avenue, Saint Louis, MO 63109 (the Premises)**.

12.     At approximately 3:21 p.m., TFO Moss relocated visual of the Volkswagen Tiguan traveling northbound on Hampton Avenue near Roberts Street. At approximately 3:22 p.m., Detective Julie Jackson observed the UC's vehicle and the Volkswagen Tiguan arrive at the parking lot of Imo's Pizza located at 1000 Hampton Avenue. Det. Jackson observed REMLEY get out of the Volkswagen Tiguan and approach the driver's side window of the UC's vehicle. At approximately 3:24 p.m., Det. Jackson observed REMLEY get back into the driver's seat of the Volkswagen Tiguan and depart the area at which time moving physical surveillance of the Volkswagen Tiguan resumed. The Volkswagen Tiguan proceeded directly to the **Premises** after the controlled purchase was completed.

13.     At approximately 3:35 p.m., TFO Moss observed the Volkswagen Tiguan arrive at the **Premises** and park on the south side of the street. TFO Moss observed REMLEY walk up to the front door of the **Premises** and walk inside the front door. TFO Nathan Knight observed that as REMLEY walked up to the residence he was not carrying anything in his hands. At approximately 3:45 p.m., Sgt. Rowe observed REMLEY walk out of the first floor unit front door of the **Premises** now carrying a grey backpack. Sgt. Rowe observed REMLEY get back into the Volkswagen Tiguan and drive away from the **Premises**. Physical surveillance of the Volkswagen Tiguan ended after it left the **Premises**.

7

14.    At approximately 3:28 p.m., Special Agent (SA) Ryan Tighe and SA Michael Carnucci met with the UC at a pre-determined location and retrieved the bag of suspected cocaine that REMLEY sold to the UC. Based on training, experience, and the instant investigation, investigators knew the color and consistency of the substance to be consistent with cocaine. Additionally, a field drug test on the substance was performed, which yielded a positive response for the presence of cocaine. During the debriefing with the UC, the UC stated that REMLEY approached the driver's side window of the UC's vehicle and handed the UC a brown paper bag that contained the suspected cocaine. The UC stated that he/she then handed REMLEY $1,500 of DEA pre-recorded official advanced funds (OAF) in exchange for the cocaine.

15.    Prior to the controlled purchase, the UC was equipped with covert audio/video recording equipment, which was later downloaded and submitted into evidence. During the controlled purchase, the UC inquired about a discount for purchasing larger quantities. In response, REMLEY revealed that he buys directly from a source of supply.

16.    Based on REMLEY's visit to the **Premises** immediately before (based on PLI information) and after (based on physical surveillance) the controlled purchase, and REMLEY's mention of a source of supply, investigators suspected HURST was REMLEY's source of supply. Investigators further believed that REMLEY obtained the cocaine sold to the UC from the **Premises** prior to the transaction, and likely returned the proceeds to the **Premises** afterwards.

### B.    _Controlled Purchase of Cocaine on February 20, 2020_

17.    On February 20, 2020, investigators conducted a second controlled transaction of cocaine from REMLEY. Your affiant was present for the operation.

18. At approximately 10:46 a.m., the UC placed a phone call to REMLEY to coordinate a time to conduct a controlled buy from REMLEY. This telephone call was not able to be recorded; however, toll analysis conducted for REMLEY's cellular phone confirmed the phone call between the UC and REMLEY. The UC asked REMLEY if REMLEY was available to meet around 2 p.m. to conduct the drug transaction. In response, REMLEY stated that he was working in the Lake St. Louis area and would not be able to meet with the UC until around 6:00 p.m. The UC then advised REMLEY that he/she could travel out towards REMLEY's location in the Lake St. Louis area to conduct the drug transaction. In response, REMLEY advised the UC that he (REMLEY) did not have the cocaine with him, and that he needed to go pick it up still. Based on previous controlled purchase from REMLEY, investigators believed REMLEY would travel to the **Premises** to pick up the cocaine prior to meeting with the UC to conduct the transaction.

19. At the onset of the controlled operation, investigators checked PLI associated with REMLEY's cellular device and learned that the device was located in the vicinity of 507 Parkland Place Drive, O'Fallon, MO 63366. At approximately 1:49 p.m., Sgt. Rowe observed the same Volkswagen Tiguan from the February 11, 2020 controlled purchase parked in the driveway of 507 Parkland Place Drive. At approximately 5:09 p.m., Sgt. Rowe observed REMLEY walk out of 507 Parkland Place Drive and get into the Volkswagen Tiguan. Investigators maintained moving physical surveillance of the Volkswagen Tiguan as it left the residence. As referenced above, investigators anticipated that REMLEY would travel to the **Premises** to pick up cocaine prior to meeting with the UC. Accordingly, at approximately 4:00 p.m., TFO Larry O'Toole established physical surveillance at the **Premises**.

9

20.      As observed by the continuous moving physical surveillance, REMLEY in the Volkswagen Tiguan traveled directly to the **Premises**. There, TFO O'Toole, conducting surveillance of the **Premises** before REMLEY arrived, also observed the Volkswagen Tiguan arrive at the **Premises** at 5:58 p.m.. REMLEY parked the Volkswagen Tiguan on the street in front of the **Premises** and walked into the front door of the **Premises**. At approximately 6:00 p.m., TFO O'Toole observed REMLEY and two males, who were later identified as Robert HURST and Subin MADATHIL, walk out of the front door of the **Premises**. TFO O'Toole did not observe REMLEY carrying anything as he came out of the **Premises**; however, the ounce quantity of cocaine that was ultimately sold to the UC was contained in a small Ziploc style baggie and could easily be concealed in a pants pocket or elsewhere on the person. TFO O'Toole observed REMLEY get back into the Volkswagen Tiguan and observed HURST and MADATHIL get into a white Infiniti SUV bearing personalized Missouri license plate ALFA-Q.[5] TFO O'Toole observed both vehicles leave the area simultaneously.

21.      Investigators maintained physical surveillance of the Volkswagen Tiguan as it left the area and proceeded directly to the Target parking lot, located at 4255 Hampton Ave., St. Louis, MO. Prior to the controlled transaction, REMLEY contacted the UC via Snapchat messaging and directed the UC to meet him at the Target Parking lot to conduct the deal.

_____

[5] Law enforcement database queries revealed that the registered owner of this vehicle is Subin MADATHIL, 5328 Bancroft Ave., Saint Louis, MO 63109.

22.     It should be noted that the location where REMLEY directed the UC to meet REMLEY is located approximately 1.2 miles away from the **Premises**. Your affiant is aware based on training and experience that drug dealers typically prefer to conduct drug transactions close to where drugs are being stored, so that they don't have to travel far with drugs in their possession and risk detection by law enforcement.

23.     At approximately 6:04 p.m., the UC arrived at the Target parking lot. At approximately 6:08 p.m., Sgt. Rowe observed the Volkswagen Tiguan arrive in the Target parking lot and park next to the UC's vehicle. At approximately 6:12 p.m., Sgt. Rowe observed the Volkswagen Tiguan drive away from the UC's vehicle. Investigators maintained physical surveillance on the Volkswagen Tiguan as it left the Target parking lot and travelled directly back to the Premises.

24.     At approximately 6:15 p.m., TFO O'Toole, who maintained constant surveillance on the **Premises** throughout the operation, observed the Volkswagen Tiguan arrive back at the **Premises** and park in front of the residence. REMLEY did not immediately exit the vehicle. At approximately 6:17 p.m., TFO O'Toole observed the white Infiniti SUV arrive back at the **Premises** and park in front of the residence. Next, TFO O'Toole observed REMLEY, HURST, and MADATHIL each simultaneously get out of their respective vehicles and walk into the front door of the **Premises**. At approximately 6:23 p.m., TFO O'Toole observed REMLEY walk out of the front door of the **Premises** empty handed, get back into the Volkswagen Tiguan and depart the area.

11

25.     Again, based on REMLEY's visit to the **Premises** immediately before and after the controlled purchase, investigators believe REMLEY obtained the cocaine sold to the UC from the **Premises** prior to the transaction, and likely returned the proceeds to the **Premises** afterwards. Further, the short duration of REMLEY's visit to the **Premise** indicates to myself and the trained and experienced investigators on my team that REMLEY obtained the sold cocaine from the **Premise**, and was not visiting the residence for a social or other purpose. The presence of HURST immediately before and after the transaction further supports investigators' belief that HURST is REMLEY's cocaine source of supply.

26.     Following the drug transaction, SA Tighe met with the UC and members of the surveillance team at a pre-determined location. SA Tighe then retrieved the clear plastic Ziploc style baggie containing the suspected cocaine from the UC. Based on training, experience, and the instant investigation, investigators knew the color and texture of the substance to be consistent with cocaine. Additionally, a field drug test was later performed which yielded a positive response for the presence of cocaine.

27.     During a post-buy debriefing with the UC, the UC stated that during the drug transaction, REMLEY handed the UC a clear plastic bag containing the cocaine, and in exchange the UC handed REMLEY $1,500 of pre-recorded SCCRDTF funds.

C.     <u>Training and Experience</u>

28.     As part of my experience and training and that of other law enforcement officers participating in the investigation, we have accumulated information and training in the areas of narcotics based economic crime. I have had extensive experience, as have other members of the

investigating team, in interviewing defendants, witnesses, informants and others who have experience in the gathering, spending, converting, transporting, distributing and concealing of proceeds of narcotics trafficking. Based upon my and the investigating team's experience and our participation in other pending and completed controlled substances and/or financial investigations involving ongoing, extensive distribution conspiracies involving large amounts of controlled substances and money, I am informed of the following:

a.      It is common for drug dealers to secrete contraband, proceeds of drug sales, and records of drug transactions in their residence or other buildings under their control.

b.      Drug traffickers frequently keep near at hand, in their residence or other buildings under their control, paraphernalia for packaging, cutting, weighing and distributing of controlled substances. These paraphernalia include, but are not limited to scales, plastic bags, and cutting agents.

c.      Drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, computer hard drives and disk records, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances. Drug traffickers commonly "front" (provide drugs on consignment) controlled substances to their clients. The aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the drug traffickers have ready access to them, specifically in their residence or in other buildings under their control.

d.      Drug traffickers commonly maintain telephone bills, invoices, packaging, cellular batteries and/or charging devices, cancelled checks or receipts for telephone purchase/service; cellular and/or landline telephones; digital and/or alphanumeric text (two-way) pagers; computers

13

capable of e-mail and/or chat-room communication, answering machines; address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers of sources of supply, of customers, and/or evidencing association in fact with  persons known to traffic in controlled substances or to facilitate such trafficking. These records are maintained where drug traffickers have ready access to them, specifically, in their residence or in other buildings under their control.

    e.    Drug traffickers take or cause to be taken photographs of them, their associates, their property, cash and currency, firearms, and controlled substances. These traffickers frequently maintain these photographs in their residence or other buildings under their control.

    f.    Persons involved in large-scale drug trafficking conceal in their residence or other buildings under their control large amounts of currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, papers, titles, deeds and other documents reflecting ownership of vehicles and property utilized in the distribution of controlled substances or which are proceeds from the distribution of controlled substances.

    g.    When drug traffickers amass large proceeds from the sale of controlled substances they attempt to legitimize these profits. I know that to accomplish these goals, drug traffickers utilize financial institutions, including but not limited to, foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts. They maintain record of these transactions in their residence or other buildings under their control.

14

h.     It is common for drug traffickers to travel to major distribution centers, such as Texas, California and/or Mexico to purchase controlled substances and/or to arrange for its distribution elsewhere in the United States.  After purchasing controlled substances, these drug traffickers will transport or cause to be transported, controlled substances to the areas in which they will distribute the controlled substances.  The methods of transportation include, but are not limited to, commercial airlines, private airlines, rental automobiles, private automobiles, and government and contract mail carriers.  Records of travel are frequently kept in their residence or other buildings under their control.

i.     Evidence of occupancy and residence including, but not limited to utility and telephone bills, canceled envelopes, rental or lease agreements, and keys, is relevant evidence in controlled substances prosecutions.

j.     Drug traffickers frequently possess firearms and/or other weapons in their residence or other buildings under their control to protect their cocaine and/or United States currency.

## CONCLUSION

29.     Based on the foregoing I submit that this affidavit supports probable cause for a warrant to search the Premises described in Attachment A and seize the items described in Attachment B.

30.     I further request that the Court order that all papers in support of this application, including the affidavit and warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their

premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

Ryan Tighe
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on February 28, 2020.

JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

16

## ATTACHMENT A

*Property to be searched*

The property to be searched is the Premises located within the first floor unit of 5328 Bancroft Avenue, St. Louis, Missouri 63109.  5328 Bancroft Avenue, St. Louis, Missouri 63109, within the Eastern District of Missouri, is described as a multi-family two-story residence with a basement in St. Louis City, Missouri.  The Premises is located on the south side of Bancroft Avenue, in between Macklind Avenue and Brannon Avenue. The Premises is a brown brick house with a white stone foundation. The Premises also has white siding on the left side of house fully depicted below.  The dwelling has two exterior front doors, a left side door that leads to the upstairs unit, and a right side door that leads to the Premises. The Premises has a screen door that covers a three-pane glass window front door. The numbers 5328 are displayed on the front of the Premises.

Picture 1



Picture 2



**ATTACHMENT B**

1.      Controlled Substances;

2.      Paraphernalia for packaging, cutting, weighing and distributing controlled substances, including, but not limited to, scales, baggies and spoons;

3.      Books, records, receipts, notes, ledgers, computer hard-drives and disk records, and other papers relating to the transportation, ordering, purchasing and distribution of controlled substances;

4.      Telephone bills, invoices, packaging, cellular batteries and/or charging devices, cancelled checks or receipts for telephone purchase/service; cellular and/or landline telephones; digital and/or alphanumeric text (two-way) pagers; computers capable of e-mail and/or chat-room communication, answering machines; address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers of sources of supply, of customers, and/or evidencing association with persons known to traffic in controlled substances or to facilitate such trafficking;

5.      Photographs, in particular photographs of co-conspirators, of assets, and/or of controlled substances;

6.      United States currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, papers, titles, deeds and other documents reflecting ownership of vehicles and property utilized in the distribution of controlled substances or which are proceeds from the distribution of controlled substances;

7.      Books, records, receipts, pay stubs, employment records, bank statements and records, money drafts, letters of credit, money order and cashier's checks receipts, passbooks, bank checks and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money;

8.      Papers, tickets, notes, schedules, receipts and other items relating to travel, including, but not limited to, travel to and from St. Louis, Missouri, and elsewhere; and

9.      Indicia of occupancy, residency, rental and/or ownership of the vehicles and/or premises described above, including, but not limited to, utility and telephone bills, cancelled envelopes, rental or lease agreements and keys.